IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| PAUL CHAN, | ) | CIV. NO. 14-00344 SOM/KSC |
| | ) | |
| Plaintiff, | ) | ORDER GRANTING IN PART AND |
| | ) | DENYING IN PART MOTION FOR |
| vs. | ) | SUMMARY JUDGMENT |
| | ) | |
| WELLS FARGO ADVISORS, LLC.; | ) | |
| JOHN DOES 1-10; JANE DOES 1- | ) | |
| 10; DOE CORPORATIONS 1-10; | ) | |
| DOE PARTNERSHIPS 1-10; DOE | ) | |
| UNINCORPORATED ORGANIZATIONS | ) | |
| 1-10; and DOE GOVERNMENTAL | ) | |
| AGENCIES 1-10, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**ORDER GRANTING IN PART AND DENYING
IN PART MOTION FOR SUMMARY JUDGMENT**

**I.      INTRODUCTION.**

This arises out of an alleged statement by a financial advisor's assistant to a supervisor that the financial advisor had made an illegal trade. Whether the financial advisor decided that he no longer wanted to work with the assistant as a result of that complaint or whether the decision to move the assistant to a different financial advisor was made for other legitimate, nondiscriminatory reasons is the question at heart of this lawsuit.

Ultimately, the assistant allegedly suffered great anxiety and was unable to work. After the assistant had exhausted his two years of unpaid medical leave, the company terminated him. Whether the company was required to grant the

assistant more leave as a reasonable accommodation is another issue before the court.

The company, Defendant Wells Fargo Advisors, has moved for summary judgment.

With respect to Count I of the First Amended Complaint, asserting a termination in violation of public policy, the court grants Wells Fargo summary judgment, as this portion of the motion is unopposed.  Plaintiff Paul Chan fails to show that he was terminated in violation of public policy.

With respect to Count II, asserting a violation of Hawaii's Whistleblowers' Protection Act, section 378-62 of Hawaii Revised Statutes, the court denies the request for summary judgment, determining that there are questions of fact as to whether Chan suffered an adverse employment action because he purportedly reported an illegal trade to his employer.

With respect to Count III, asserting a claim of intentional infliction of emotional distress, the court grants summary judgment in favor of Wells Fargo, determining that Hawaii's workers' compensation provisions provide the exclusive remedy for work-related injuries.  If appropriate, however, emotional distress damages may be sought as a remedy in connection with other causes of action.

With respect to Count IV, asserting a claim of punitive damages, the court grants summary judgment in favor of Wells

Fargo because no independent claim for punitive damages exists. However, if appropriate, punitive damages may be sought as a remedy in connection with other causes of action.

Finally, with respect to Count V, asserting a claim of disability discrimination, the court denies Wells Fargo's request for summary judgment, determining that there are issues of fact as to whether Wells Fargo engaged in the required interactive process to determine whether it could make any reasonable accommodation that would have allowed Chan to return to work.

## II.      **FACTUAL BACKGROUND.**

In 1998, Chan was hired as a client associate by Herman Ching, a senior financial advisor at Prudential Securities.  See Decl. of Paul Chan ¶ 3, ECF No. 52-6, PageID # 985; Decl. of Herman Ching ¶ 6, ECF No. 47-17, ECF No. 756.  Chan coordinated Herman Ching's clients and appointments for 15 years.  Chan Decl. ¶ 10.  Every month, Herman Ching gave Chan an envelope containing between $100 and $1,000 to personally thank Chan.  In other words, this money came from Herman Ching, not the company.  Id. ¶ 12; Videotaped Depo. of Paul Chan at 105-06, ECF No. 47-2, PageID #s 393-94; Videotaped Depo. of Herman Ching at 28, ECF No. 52-2, PageID # 918; Herman Ching Decl. ¶ 17, ECF No. 47-17, PageID # 758.  Herman Ching also gave Chan gifts for special occasions like Christmas or his birthday, and whenever Ching

wanted to reward him, such as when Ching had a good month.  See Chan Depo. at 119, ECF No. 47-2, PageID # 397.

Prudential Securities eventually became Wells Fargo. Chan Decl. ¶ 7.

In May 2009, Chan became the primary client associate for Eric Ching, Herman Ching's son.  See Herman Ching Decl. ¶¶ 11, 20, ECF No. 47-17, PageID # 757-59.  At the same time, Kay Yamasaki became Herman Ching's primary client associate.  Id. ¶ 20, ECF No. 47-17, PageID # 759.

Eric Ching continued his father's practice of giving Chan personal cash gifts to thank Chan for his work.  These gifts came from Eric Ching's personal funds, not the company's, see Decl. of Eric Ching ¶ 8, ECF No. 47-18, PageID # 763, and were less frequent than those from Herman Ching, see Chan Decl. ¶ 13, ECF No. 52-6, PageID # 986; Chan Depo. at 119, ECF No. 47-2, PageID # 397.

Herman Ching, Eric Ching, Chan, and Yamasaki all reported to Thomas McCarthy, a Senior Vice President-Complex Manager for Wells Fargo.  Herman Ching Decl. ¶ 13, ECF No. 47-17, PageID # 757.

In June 2012, one of Wells Fargo's clients called, concerned that her required minimum IRA distribution was late. Herman Ching told Chan that the client was unhappy.  See Chan Depo. at 134-35, ECF No. 47-2, PageID # 407-08.  On Friday, June

4

22, 2012, Chan processed the client's request for the required minimum distribution.  See Chan. Decl. ¶ 22, ECF No. 52-6, PageID # 987.  In so doing, Chan noticed that funds were missing from the client's IRA account.  Id. ¶ 23.  Chan says that Eric Ching must have violated the law by trading with the client's funds without permission.  Chan concludes this based on Eric Ching's statement to Chan that, seeing a cash balance in the client's account, he had made investments in what Eric Ching called a "discretionary account."  Id. ¶¶ 25-28, ECF No. 52-6, PageID # 988.  In his deposition, Chan was asked whether he knew whether Eric Ching had permission to make the trade.  Chan indicated that he did not know, but had to assume that Eric Ching had such permission.  See Chan Depo. at 148-49, ECF No. 47-2, PageID # 409-10.

Chan says that Yamasaki cancelled the paperwork he prepared to get the client paid.  Chan Decl. ¶ 30, ECF No. 52-6, PageID # 988.  Yamasaki had processed the same paperwork, and one of the two payment requests had to be cancelled.  See McCarthy Decl. ¶ 12, ECF No. 47-19, PageID # 770.  Chan was livid about this.  He says that, because he had been verbally and physically harassed by Yamasaki, causing him to avoid talking with her from about 2005, he went to the copy room and ranted.  Id. ¶ 31.  Not knowing that anyone else was in the copy room, Chan complained, "What the hell is she doing?  Why is she bulldozing people?  She

successfully chased away her daughter and her husband cheated on her." Id., PageID # 989. Another staff member overheard Chan and reported his statements to Yamasaki. Id. Yamasaki then complained about Chan's rant to Wells Fargo's human resource department. See id. ¶ 38, PageID # 990.

The next working day, Monday, June 25, 2012, Herman Ching told Chan that human resources was involved and that Chan had to leave the office and not come back until told to do so. Chan Decl. ¶ 34, ECF No. 52-6, PageID # 989. Chan was later told by Eric Ching to return to work the next day for a meeting with Herman Ching and McCarthy. Id. ¶ 41, PageID # 990.

On Tuesday, June 26, 2012, Chan met with Herman Ching and McCarthy separately. Chan Decl. ¶ 42, ECF No. 52-6, PageID # 990. Chan admitted what he had said in the copy room. Id. Chan says he explained to Herman Ching and McCarthy what had happened before he went on his rant, including describing the possible unauthorized trade. Id. ¶¶ 42-44, PageID # 991. McCarthy, on the other hand, says Chan only complained about Yamasaki's conduct, not Eric Ching's. See McCarthy Decl. ¶ 15, ECF No. 47-19, PageID #s 770-71. This is consistent with Eric Ching's statement that he was unaware that Chan had complained about him. See Eric Ching Decl. ¶ 14, ECF No. 47-18, PageID # 765.

On July 11, 2012, McCarthy issued Chan a formal warning for having vented in the copy room.  See ECF No. 47-20, PageID # 774.  In that warning, McCarthy explained that he was moving Chan's work area "to improve the environment and reduce involvement with the other parties involved."  Id.  In other words, McCarthy separated Chan and Yamasaki.  See McCarthy Decl. ¶ 16, ECF No. 47-19, PageID #s 771 ("I decided to move Mr. Chan's desk away from Ms. Yamasaki's desk.  I thought that if they had more physical distance between their work stations, it would ease the tension between them.").

Eric Ching says that, by late July or early August 2012, he had decided that he wanted a new client associate.  See Decl. of Eric Ching ¶ 11, ECF No. 47-18, PageID # 764.  He explained,

> I wanted a Client Associate with more regular working hours and the ability to meet my needs in terms of completing work in the time period I expected the Client Associate to complete it.  I also wanted a Client Associate who took me seriously even though I was younger and less experienced than other Financial Advisors in the Group; and, despite the fact I am Herman Ching's son.

Id.  According to Eric Ching, by August 2012, Chan's work performance had worsened.  Ching says that, for example, Chan no longer completed work as quickly and sometimes did not do his paperwork at all.  Id. ¶ 12, PageID # 764-65.  Eric Ching says

7

that it is common to reassign client associates among financial advisors.  Id. ¶ 18, ECF No. 47-18, PageID # 766.

Chan disputes Ching's statements about Chan's unreliability.  Chan says that, because he could only carry over 5 days of vacation time, he left early on some days to use his vacation.  He says he would stay whenever Eric Ching needed him. See Chan Decl. ¶¶ 63-64, ECF No. 52-6, PageID # 994.  He recalls taking time off to be with his sick mother before she died and then taking bereavement leave.  Id. ¶¶ 65-68.  Chan denies that he was performing poorly, pointing out that Herman Ching praised his work in 2012.  Id. ¶ 72-75, PageID # 995.  Herman Ching described Chan's work in 2012 as "excellent."  See Videotaped Depo. of Herman Ching at 48, ECF No. 52-2, PageID # 920.

Eric Ching talked about changing assistants with his father, who recommended a change to McCarthy.  See Decl. of Herman Ching ¶ 22, ECF No. 47-17, PageID # 759.  It was McCarthy who made the decision to transfer Chan to another advisor.  Id. ¶ 26, PageID # 760; Chan Decl. ¶ 51, ECF No. 52-6, PageID # 992.

On August 15, 2012, Herman Ching told Chan that Eric Ching no longer wanted to work with Chan.  See Chan Decl. ¶ 49, ECF No. 52-6, PageID # 992; Decl. of Herman Ching ¶ 26, ECF No. 47-17, PageID # 760.  Chan then became the client associate for Thomas Lau, another financial advisor.  Wells Fargo says that Chan's pay and bonuses from Wells Fargo remained the same.

8

Herman Ching Decl. ¶ 29, ECF No. 47-17, PageID # 760.  But Chan says that working for Lau, who was about to retire, was not as prestigious as working for the Chings.  Chan Decl. ¶ 82, ECF No. 52-6, PageID # 996.  For his part, Herman Ching described the transfer as a good opportunity for Chan, not a demotion.  He said that, although Lau was 84 years old, he was still working and had Chinese clients constituting 25% to 30% of his clients.  Because Chan spook Chinese, Herman Ching thought Chan could help grow Lau's business.  See Ching Depo. at 119-20, ECF No. 52-2, PageID # 927.

Herman Ching says that Chan's workload also remained the same, as he also began working for Herman Ching more.  Id. ¶ 29.  Although paragraph 61 of the First Amended Complaint alleges that the transfer to Lau caused Chan's pay to fall by over 19%, ECF No. 40, PageID # 260, Chan explained in an interrogatory answer that this reduction resulted from losing his "supplemental pay . . . from no longer working with Eric Ching." ECF No. 47-16, PageID # 748.  Any reduction in pay was thus related to the loss of "tokens of appreciation" or personal gifts from Eric and Herman Ching.  See Chan Decl. ¶ 79, ECF No. 52-6, PageID # 996.

Although Chan was told that he would be losing his $400 per paycheck bonus as a result of the move, see Chan Decl. ¶ 78, ECF No. 52-6, PageID # 996, he actually received the bonus until

he stopped working in September 2012.  See Chan Depo. at 130, ECF No. 52-4, PageID # 954.  Chan says that the bonuses were to continue only temporarily while he was transitioning to working for Lau.  Chan Depo. at 129, ECF No. 52-4, PageID # 953.  Because Chan stopped working before that transitional period ended, he did not lose out on any paycheck bonuses.  The record is not clear as to whether Lau could have asked Wells Fargo to maintain the bonus of $400 per paycheck.

According to Chan, he was "devastated" by the news that Eric Ching no longer wanted to work with him.  Chan says he took time off, returning to work on August 21, 2012.  When he returned, both Herman and Eric Ching allegedly "blasted" him for having jeopardized a good client.  Chan Decl. ¶¶ 54-55, ECF No. 52-6, PageID # 992-93.  Chan says he was then told that he no longer had access to Herman Ching's and Eric Ching's accounts. Id. ¶ 56.

Chan reports that he then "went on leave from work due to stress from work that resulted in me having major depression and I went out on work comp."  Chan Decl. ¶ 85, ECF No. 52-6, PageID #s 996-97.  Chan says that he took advantage of a Wells Fargo policy allowing employees to take 24 months of leave.  Id. ¶ 88.  Chan began his unpaid medical leave of absence on September 28, 2012.  See Decl. of Terricia Gaines ¶¶ 8-9, ECF No. 47-21, PageID # 778.

10

On or about October 8, 2012, Wells Fargo wrote to Chan to inform him that it had received information that he was on a leave of absence because of an on-the-job injury or illness.  <u>See</u> ECF No. 47-23, PageID # 789.

On or about December 28, 2012, Wells Fargo wrote to Chan to say that he had exhausted his leave under the Family Medical Leave Act.  The letter mentioned that Chan's employment was not ending and that Chan was eligible for benefits through the balance of his approved leave, which was a maximum of 24 months.  <u>See</u> ECF No. 47-24, PageID # 791.

Apparently, Chan requested medical leave.  In response, on or about July 31, 2013, Wells Fargo sent Chan a letter stating, "To qualify for an approved, unpaid Medical Leave, please review and complete the steps below," including submitting a Medical Certification Form.  ECF No. 47-25, PageID # 795.

On or about August 9, 2013, Chan's physician, Dr. Pien, sent Wells Fargo the requested Medical Certification Form, stating that Chan had "anxiety attacks at work, significant anxiety when thinking upon returning there, in Sept., 2012, daily depression with almost daily poor appetite, insomnia, low energy, difficulty making decisions."  ECF No. 47-26, PageID # 807.  Dr. Pien estimated that the conditions would last until August 30, 2014.  <u>Id.</u>

On or about August 12, 2013, Wells Fargo approved unpaid medical leave from September 28, 2012, to February 1, 2014.  It informed Chan that, if he needed additional time off, he needed to submit another medical certification.  See ECF No. 47-27, PageID # 810.

On or about February 1, 2014, Dr. Pien sent Wells Fargo an updated Medical Certification Form.  Dr. Pien certified that Chan would be unable to work through February 13, 2015, because of "severe depression anxiety attacks."  See ECF No. 47-30, PageID # 830-33.

Chan's medical file includes a note dated June 10, 2014, in which Dr. Pien wrote, "Plans to proceed wi. litigation. Has to decide whether to resign or be terminated this month." ECF No. 47-13, PageID #709.

Chan filed the present action in state court on June 30, 2014.  See ECF No. 1-1.

In a note in Chan's medical file dated July 8, 2014, Dr. Pien wrote, "Proceeding w/ litigation.  Attorney recommended he let company fire him come Aug. 1.  Plans to try to apply at Walmart.  Hard to move to another employer w/o closure.  Working part time helping aunt's flower business.  Functional there." ECF No. 47-13, PageID # 708.

On or about July 22, 2014, Dr. Pien sent Wells Fargo an updated Medical Certification Form.  Dr. Pien certified that Chan

would be unable to work through August 11, 2015, because of anxiety attacks.  See ECF No. 47-33, PageID # 839-43.

On or about July 24, 2014, Wells Fargo approved unpaid medical leave through August 1, 2014.  It informed Chan that, if he needed additional time off, he needed to submit another medical certification.  See ECF No. 47-32, PageID # 837.

On July 25, 2014, Wells Fargo sent Chan a letter "reminding" him of the company's extended leave policy and stating that, pursuant to that policy, an employee could be on leave for a maximum of 24 months.  After that time, according to the policy, Chan was told he would be terminated.  See ECF No. 47-34, PageID # 845.  That same day, Chan's attorney noted that Chan had requested a reasonable accommodation, but the e-mail noting the request did not state what reasonable accommodation was being sought.  See E-mail from Joseph Rosenbaum to Alyson A. Smith, ECF No. 52-5, PageID # 976.  Chan says he could have "returned to work if protected from [his] harassers and those that retaliated against [him]."  Chan Decl. ¶ 94, ECF No. 52-6, PageID # 998.

On or about July 28, 2014, Chan's attorney again requested what he claimed was a reasonable accommodation, this time explaining that Chan was seeking more leave under the Americans with Disabilities Act.  See E-mail from Joseph Rosenbaum to "leavepr@wellsfargo.com," ECF No. 52-5, PageID # 975

13

(time-stamped "July 28, 2014, 10:12 AM"); Chan Decl. ¶ 89, ECF No. 52-6, PageID # 997.  Although Chan says that request was ignored, id. ¶ 90, Wells Fargo, in a letter dated July 28, 2014, approved more medical leave for Chan, this time through October 5, 2014.  See ECF No. 47-35, PageID # 849.

On July 31, 2014, Defendants removed the case to this court.  See ECF No. 1.

On or about September 26, 2014, Dr. Pien certified to Wells Fargo that Chan would be unable to return to work until April 4, 2015, given Chan's anxiety attacks, which would likely worsen if Chan returned to work.  See ECF No. 47-36, PageID #s 853-55.

On October 5, 2014, Wells Fargo terminated Chan's employment.  See Answer to First Amended Complaint ¶ 82, ECF No. 45, PageID # 308 ("Defendant admits that Plaintiff's employment was terminated, effective October 5, 2014.")

## III.        SUMMARY JUDGMENT STANDARD.

Summary judgment shall be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a) (2010).  See Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).  A movant must support his position that a material fact is or is not genuinely disputed by either "citing to particular parts of materials in the record,

including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials"; or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c). One of the principal purposes of summary judgment is to identify and dispose of factually unsupported claims and defenses. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). Summary judgment must be granted against a party that fails to demonstrate facts to establish what will be an essential element at trial.  See id. at 323.  A moving party without the ultimate burden of persuasion at trial--usually, but not always, the defendant--has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment. Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000).

The burden initially falls on the moving party to identify for the court those "portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact."  T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing Celotex Corp., 477 U.S. at 323).  "When the moving party has carried its burden

under Rule 56(c), its opponent must do more than simply show that
there is some metaphysical doubt as to the material facts."
Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,
586 (1986) (footnote omitted).

The nonmoving party must set forth specific facts
showing that there is a genuine issue for trial.   T.W. Elec.
Serv., Inc., 809 F.2d at 630.  At least some "'significant
probative evidence tending to support the complaint'" must be
produced.  Id. (quoting First Nat'l Bank of Ariz. v. Cities Serv.
Co., 391 U.S. 253, 290 (1968)).  See Addisu, 198 F.3d at 1134 ("A
scintilla of evidence or evidence that is merely colorable or not
significantly probative does not present a genuine issue of
material fact.").  "[I]f the factual context makes the non-moving
party's claim implausible, that party must come forward with more
persuasive evidence than would otherwise be necessary to show
that there is a genuine issue for trial."  Cal. Arch'l Bldg.
Prods., Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468
(9th Cir. 1987) (citing Matsushita Elec. Indus. Co., 475 U.S. at
587).  Accord Addisu, 198 F.3d at 1134 ("There must be enough
doubt for a 'reasonable trier of fact' to find for plaintiffs in
order to defeat the summary judgment motion.").

All evidence and inferences must be construed in the
light most favorable to the nonmoving party.  T.W. Elec. Serv.,
Inc., 809 F.2d at 631.  Inferences may be drawn from underlying

16

facts not in dispute, as well as from disputed facts that the judge is required to resolve in favor of the nonmoving party. Id.  When "direct evidence" produced by the moving party conflicts with "direct evidence" produced by the party opposing summary judgment, "the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact."  Id.

IV.      **ANALYSIS.**

   **A.   Summary Judgment is Granted in Favor of Wells Fargo With Respect to Count I (Termination in Violation of Public Policy).**

Count I of the First Amended Complaint asserts a claim of termination in violation of public policy, recognized by the Hawaii Supreme Court in Parnar v. Americana Hotels, Inc., 65 Haw. 370, 652 P.2d 625 (1982).  Parnar adopted the "public policy exception" to the at-will employment doctrine:

> Because the courts are a proper forum for modification of the judicially created at-will doctrine, it is appropriate that we correct inequities resulting from harsh application of the doctrine by recognizing its inapplicability in a narrow class of cases.  The public policy exception discussed herein represents wise and progressive social policy which both addresses the need for greater job security and preserves to the employer sufficient latitude to maintain profitable and efficient business operations. We therefore hold that an employer may be held liable in tort where his discharge of an employee violates a clear mandate of public policy.  In determining whether a clear mandate of public policy is violated, courts should inquire whether the employer's conduct

17

> contravenes the letter or purpose of a
> constitutional, statutory, or regulatory
> provision or scheme.

Id. at 379-80, 652 P.2d at 631 (footnotes omitted).

Wells Fargo argues that the public policy exception to the at-will doctrine is inapplicable to this case, as Chan was not terminated because he had complained about Eric Ching's trade.  Wells Fargo argues that there is no Parnar claim for wrongful "demotion" in violation of public policy, for a discharge based on a work-related injury, or for a discharge in violation of discrimination laws.  Wells Fargo also argues that Parnar's public policy exception is inapplicable because Chan's rights based on his complaints are specifically covered by other laws.

Chan does not oppose summary judgment with respect to his Parnar claim.  At the hearing on the motion, Chan indicated that he would not pursue Count 1.  Accordingly, summary judgment is granted in favor of Wells Fargo with respect to Count I of the First Amended Complaint because the motion is unopposed and because Chan fails to make any showing that he has an actionable claim under Parnar.

**B.   Summary Judgment is Denied With Respect to Chan's Claim Under Hawaii's Whistleblower Protection Act.**

Count II of the First Amended Complaint asserts that Wells Fargo violated the Hawaii Whistleblowers' Protection Act

("HWPA"), section 378-62 of Hawaii Revised Statutes, which

states:

> An employer shall not discharge, threaten, or
> otherwise discriminate against an employee
> regarding the employee's compensation, terms,
> conditions, location, or privileges of
> employment because:
>
> (1) The employee, or a person acting on
> behalf of the employee, reports or is about
> to report to the employer, or reports or is
> about to report to a public body, verbally or
> in writing, a violation or a suspected
> violation of:
>
>> (A) A law, rule, ordinance, or
>> regulation, adopted pursuant to law of this
>> State, a political subdivision of this State,
>> or the United States; or
>>
>> (B) A contract executed by the State, a
>> political subdivision of the State, or the
>> United States,
>
> unless the employee knows that the report is false; or
>
> (2) An employee is requested by a public body
> to participate in an investigation, hearing,
> or inquiry held by that public body, or a
> court action.

Based on the language of the statute, this court has extrapolated

three elements:

> First, there must be a showing that the
> employee engaged in protected conduct as it
> is defined by the HWPA.  Second, the employer
> is required to take some adverse action
> against the employee.  Third, there must be a
> causal connection between the alleged
> retaliation and the whistleblowing.  In other
> words, to meet the causal connection
> requirement, the employer's challenged action
> must have been taken because the employee
> engaged in protected conduct.

<u>Griffin v. JTSI, Inc.</u>, 654 F. Supp. 2d 1122, 1130-31 (D. Haw. 2008) (citations, quotation marks, and alterations omitted).

In <u>Crosby v. State Department of Budget & Finance</u>, 76 Haw. 332, 342, 876 P.2d 1300, 1310 (1994), the Hawaii Supreme Court essentially adopted the familiar <u>McDonnell Douglas</u> burden-shifting framework for claims under Hawaii's Whistleblowers' Protection Act.  Accordingly, a plaintiff can prove retaliation through direct evidence.  Alternatively, as noted in <u>Crosby</u>, a plaintiff must demonstrate that the plaintiff's protected action played a role in an employer's challenged action.  The employer can then defend by affirmatively showing that the challenged action would have occurred regardless of the protected activity. The burden of proof, however, always remains with the plaintiff. <u>Id.</u>  In <u>Black v. Correa</u>, 2008 WL 3845230, *11 (D. Haw. Aug. 18, 2008), a judge of this district expressly applied the <u>McDonnell Douglas</u> burden-shifting framework to a retaliation claim asserted under section 378-62.

### 1.   Prima Facie Case.

This court begins with determining whether Chan has demonstrated a prima facie case of retaliation under section 378-62.  There is a question of fact as to whether Chan engaged in protected conduct as defined by the HWPA.  Chan and Eric Ching were both supervised by McCarthy.  Although McCarthy denies it, Chan says he told McCarthy about what he viewed as a possible

illegal trade by Eric Ching.  That alleged conduct would qualify as a report to Chan's employer of a suspected violation of law or regulation.  The court is unpersuaded by Wells Fargo's argument that, because Chan did not report the violation to certain government authorities, Chan did not engage in protected conduct. Section 378-62 contains no requirement that the suspected violation be reported to any governmental authority, instead specifically providing that the report can be made to an employer.  Additionally, section 378-62 provides that qualifying conduct includes the situation in which an employee is about to report a violation.  Clearly, no actual report to a government authority is necessary for section 378-62 to apply.

Wells Fargo argues that Chan cannot meet the second element of an HWPA claim--that Chan suffered an adverse action-- because Chan was reassigned to another financial planner with the same duties and pay.  For purposes of this motion, the court is unpersuaded by this argument.  In Crosby v. State Department of Budget & Finance, 76 Haw. 332, 341, 876 P.2d 1300, 1309 (1994), the Hawaii Supreme court noted that the legislature did not define "compensation, terms, conditions, location, or privileges of employment" as used in section 378-62.  The Supreme Court stated that a "broad reading of the term 'condition' in the HWPA is in accord with legislative intent," which the court noted was to provide protection to employees who report suspected

21

violations of law from "*any form of retaliation* by their employers." Id. (citing Sen. Stand. Comm. Rep. No. 1127, 1987 Senate Journal at 1391).

In Black, Judge Ezra applied the Ninth Circuit's test for adverse employment actions in Title VII cases to an HWPA claim.  Citing Ray v. Henderson, 217 F.3d 1234, 1243 (9th Cir 2000), Judge Ezra stated, "an action is cognizable as an adverse employment action if it is reasonably likely to deter employees from engaging in protected activity."  Black, 2008 WL 3845230, *11.  In Ray, 217 F.3d at 1243, the Ninth Circuit noted that "lateral transfers, unfavorable job references, and changes in work schedules" are all likely to deter employees from engaging in protected activity.  In Fonseca v. Sysco Food Services of Arizona, Inc., 374 F.3d 840, 847 (9th Cir. 2004), the Ninth Circuit noted that adverse employment actions include things such as reducing an employee's compensation, paying the employee late, or giving the employee a warning letter or a negative review.

In the present case, there is a question of fact as to whether Chan suffered an actionable change in compensation, terms, conditions, location, or privileges of employment for purposes of his HWPA claim.  It is the jury that must determine whether the actions taken against Chan were reasonably likely to deter an employee from engaging in protected conduct.  Chan was transferred from being the assistant to Eric Ching to being the

22

assistant to Lau.  Although Wells Fargo disputes Chan's view,
Chan says that working for Lau was less prestigious than working
for Eric Ching.  Chan also says that, had he continued to work
for Lau, his compensation would have been cut because his $800-
per-month paycheck bonus would have been phased out.  Chan also
says that his desk was moved.  The totality of these actions is
sufficient to create a triable issue as to whether Chan suffered
an actionable change to his compensation, terms, conditions,
location, or privileges of employment.

Chan also raises a question of fact as to causation.
Temporal proximity may be a factor in determining whether a
causal connection exists.  Griffin, 654 F. Supp. 2d at 1131-32.
That is, causation may be inferred when an adverse employment
action occurs "fairly soon after the employee's protected
expression."  Villiarimo v. Aloha Island Air, Inc., 281 F.3d
1054, 1065 (9th Cir. 2002); Yartzoff v. Thomas, 809 F.2d 1371,
1376 (9th Cir. 1987) ("Causation sufficient to establish the . .
. [causal link] element of the prima facie case may be inferred
from circumstantial evidence, such as the employer's knowledge
that the plaintiff engaged in protected activities and the
proximity in time between the protected action and the allegedly
retaliatory employment decision.").  Interpreting the facts in
the light most favorable to Chan, this court concludes that a
reasonable jury could infer causation based on the timing of

events.  Chan says that he told McCarthy on June 26, 2012, about
the possible illegal trade.  On July 11, 2012, McCarthy issued
Chan a formal warning for having vented in the copy room and
changed the location of Chan's workspace.  By late July or early
August, Eric Ching had decided that he wanted a new client
associate.  On August 15, 2012, Herman Ching informed Chan that
Eric Ching no longer wanted to work with Chan.  McCarthy then
transferred Chan to be Lau's client associate.  Less than two
months separated Chan's alleged whistleblowing from his transfer.

### 2.    Legitimate Nondiscriminatory Reason.

Having determined that Wells Fargo is not entitled to
summary judgment on the issue of whether Chan has made out a
prima facie case of retaliation under section 378-62, the court
turns to whether Wells Fargo's actions were justified by
legitimate nondiscriminatory reasons.

With respect to McCarthy's decision to relocate Chan to
a different workspace, McCarthy indicated that he did that to
reduce Chan's involvement with Yamasaki, the employee that Chan
vented about.  This is a sufficient legitimate nondiscriminatory
reason for purposes of this motion.

With respect to Chan's reassignment to Lau, the court
also determines that, for purposes of this motion, Wells Fargo
demonstrates legitimate nondiscriminatory reasons for its
actions.  Eric Ching says he made the determination to get a new

client associate because he wanted one with more regular hours
and one that would complete the work assigned in a timely manner,
as Chan had previously done.  Eric Ching says it is common to
reassign client associates.

### 3.    Pretext.

Judge J. Michael Seabright of this court has recognized
that the timing of adverse employment actions can sometimes
suffice as circumstantial evidence for both a prima facie case
and evidence of pretext.  See Patrick v. 3D Holdings, LLC, 2014
1094917, *11 (D. Haw. March 18, 2014).  A reasonable jury could
infer from the timing of events that, once Eric Ching found out
that Chan had reported his possible illegal trade to McCarthy,
Eric Ching decided that Chan no longer had his back and that
Ching no longer wanted to work with Chan.  Additionally, Chan
disputes Eric Ching's characterization of Chan as unreliable.
There is a question of fact as to whether Ching's statement that
he wanted a more reliable assistant was a pretext for retaliating
against Chan for whistleblowing.

### C.    Summary Judgment is Granted in Favor of Wells Fargo With Respect to Count III--IIED.

Count III of the First Amended Complaint asserts a
claim of intentional infliction of emotional distress.  To prove
this tort under Hawaii law, a plaintiff must show: "1) that the
act allegedly causing the harm was intentional or reckless,
2) that the act was outrageous, and 3) that the act caused

25

4) extreme emotional distress to another." <u>Hac v. Univ. of Haw.</u>,
102 Haw. 92, 106-07, 73 P.3d 46, 60-61 (2003); <u>see also</u> <u>Simmons</u>
<u>v. Aqua Hotels & Resorts, Inc.</u>, 130 Haw. 325, 332, 310 P.3d 1026,
1033 (Ct. App. 2013). "Outrageous" conduct is that "exceeding
all bounds usually tolerated by decent society and which is of a
nature especially calculated to cause, and does cause, mental
distress of a very serious kind." <u>Hac</u>, 102 Haw. at 106, 73 P.3d
at 60.

Wells Fargo seeks summary judgment with respect to
Chan's IIED claim, arguing that Hawaii's Workers' Compensation
Statute, section 386-5 of Hawaii Revised Statutes, provides the
exclusive remedy for work-related injuries, including emotional
distress related to work. Section 386-5 states:

> The rights and remedies herein granted to an
> employee or the employee's dependents on
> account of a work injury suffered by the
> employee shall exclude all other liability of
> the employer to the employee, the employee's
> legal representative, spouse, dependents,
> next of kin, or anyone else entitled to
> recover damages from the employer, at common
> law or otherwise, on account of the injury,
> except for sexual harassment or sexual
> assault and infliction of emotional distress
> or invasion of privacy related thereto, in
> which case a civil action may also be
> brought.

The Hawaii Supreme Court has explained, "Generally, the
workers' compensation scheme serves to bar a civil action for
physical and emotional damages resulting from work-related
injuries and accidents." <u>Nelson v. Univ. of Haw.</u>, 97 Haw. 376,

393, 38 P.3d 95, 112 (2001).  The Intermediate Court of Appeals for the State of Hawaii has recognized the "sweeping scope" of section 386-5, stating, "Under the workers' compensation statute, the workers' compensation benefits provided to an employee on account of a work injury "shall exclude all other liability of the employer to the employee . . ." on account of that injury. Yang v. Abercrombie & Fitch Stores, 128 Haw. 173, 177, 284 P.3d 946, 950 (Ct. App. 2012).

In Yang, a store manager was terminated by Abercrombie & Fitch after money in a wallet that had been found in the store had gone missing.  Yang sought and received workers' compensation benefits for resulting stress-related injuries.  She then filed suit against Abercrombie & Fitch for, among other things, IIED. Id. at 174-75, 284 P.3d at 947-48.  The Intermediate Court of Appeals held that Yang's IIED claim was barred by section 386-5, as it was a personal injury allegedly arising out of and in the course of Yang's employment.  Id. at 177, 284 P.3d at 954.

In Kamaka v. Goodsill Anderson Quinn & Stifel, 117 Haw. 92, 109, 176 P.3d 91, 108 (2008), the Hawaii Supreme Court examined the language of section 386-5, similarly determining that it

> unambiguously provides that claims for
> infliction of emotional distress or invasion
> of privacy are not subject to the exclusivity
> provision when such claims arise from claims
> for sexual harassment or sexual assault, in
> which case a civil action may be brought.

27

Inasmuch as Kamaka has alleged a claim for
emotional distress, that does not arise out
of sexual harassment or sexual assault, such
claim is, pursuant to HRS § 386-5, barred.

Consistent with this reading of section 386-5, the

Ninth Circuit has ruled that IIED claims arising out of alleged

employment discrimination are barred by section 386-5.  See

Courtney v. Canyon Television & Appliance Rental, Inc., 899 F.2d

845, 851 (9th Cir. 1990).

Section 386-5 includes narrow exceptions to its

exclusivity, including an exception "for sexual harassment or

sexual assault and infliction of emotional distress or invasion

of privacy thereto."  The Intermediate Court of Appeals for the

State of Hawaii has interpreted this language, stating that the

legislature has carved out exceptions for claims of "sexual

harassment or sexual assault—-not harassment or assault in

general; infliction of emotional distress related to sexual

assault or sexual harassment--not just any infliction of

emotional distress; [and] invasion of privacy related to sexual

assault or sexual harassment--not invasion of privacy generally."

Yang, 128 Haw. at 177, 284 P.3d at 950).

The Hawaii Supreme Court, in Furukawa v. Honolulu

Zoological Society, 85 Haw. 7, 936 P.2d 643 (1997), also

recognized that, in connection with a gender and race

discrimination claim brought under section 378-2(1) of Hawaii

Revised Statutes, a plaintiff could seek emotional distress

28

damages.   In so ruling, the Hawaii Supreme Court reversed the trial court's determination that section 386-5 barred such emotional distress damages.   The Hawaii Supreme Court reasoned that, under section 368-17(a), which pertains to remedies before the Hawaii Civil Rights Commission, the remedies available include compensatory and punitive damages, including damages for injuries and losses caused by a violation of part 1 of chapter 378.   Section 368-17(b) specifically states that section 386-5 does not bar relief for claims filed with the commission.   Id. at 17-18, 936 P.2d at 653-54.   Because the commission could order compensatory damages, the Hawaii Supreme Court stated that both the "Commission and the courts clearly have the power to award compensatory damages, including damages for emotional distress . . . ."   Id. at 18, 936 P.2d at 654.

In Furukawa, the Hawaii Supreme Court stated that the trial court had held that section 386-5 "barred Furukawa from making a claim for emotional distress . . . ."   Id. at 16-17, 936 P.2d at 652-53.   But an examination of the First Amended Complaint in Furukawa indicates that no independent claim for emotion distress was asserted by Furukawa.   The First Amended Complaint asserted only two claims.   In the first, Furukawa asserted that the Honolulu Zoological Society discriminated against him based on his race and his gender in violation of section 378-2(1) and section 368-1 of Hawaii Revised Statutes.

29

In the second, Furukawa asserted that the Honolulu Zoological Society failed to respond to a written grievance in violation of the personnel manual such that he was wrongfully terminated.  See Plaintiff's First Amended Complaint for Declaratory Relief and Damages, Civ. No. 92-2037-06 (Nov. 30, 1992).  Accordingly, the Hawaii Supreme Court's reference to the trial court decision barring Furukawa from making a "claim for emotional distress" is properly read as a reference to emotional distress damages available to a person making a claim under section 378-2(1) of Hawaii Revised Statutes, rather than under an independent IIED claim.

In an unpublished, summary disposition order, the Intermediate Court of Appeals for the State of Hawaii stated that "Hawai`i state courts have applied the HRS § 386-5 exclusivity provisions to IIED claims, unless they arise out of sexual harassment, assault, or discrimination" claims.  Bolla v. Univ. of Haw., 2014 WL 80554, *2 (Haw. Ct. App. Jan. 8, 2014).  In so stating, the court cited Yang, Kamaka, and Furukawa.  The Bolla decision may have used "sexual" as an adjective modifying not only "harassment," but also "assault" and "discrimination."  Such a reading would be consistent with Yang, which stated that the plain language of section 386-5 bars claims unless they relate to "sexual harassment or sexual assault—-not harassment or assault in general."  Yang, 128 Haw. at 177, 284 P.3d at 950.

It appears to this court that the only way to reconcile the state appellate decisions is to read them as barring under section 386-5 independent IIED claims that are not related to sex, while not barring emotional distress damages that fall within the allowable compensatory damages recoverable in connection with other cognizable claims.

The court recognizes that it has previously noted that Furukawa might possibly be read as indicating that IIED resulting from any form of discrimination might escape the bar of section 386-5. See Jinadasa v. Brigham Young University-Hawaii, 2015 WL 3407832 at *7 (D. Haw. May 27, 2015). However, the court saw no need in Jinadasa to actually decide whether section 386-5 barred Jinadasa's race discrimination claim. Saying only that it was declining at that time to find the claim barred by section 386-5 (not that it was ruling that the claim was so barred), the court dismissed the IIED claim "[g]iven the bareness of Jinadasa's factual allegations." Id. at *8.

The court similarly declined to make a definitive ruling on the scope of section 386-5's exclusivity bar in McAllister v. U.S. Veterans Initiative, 2015 WL 2345595 (D. Haw. May 14, 2015. In that case, this court questioned without deciding whether the Hawaii Supreme Court would apply the exclusivity provision in section 386-5 to disability claims asserted under section 378-32 of Hawaii Revised Statutes, which

31

generally prohibits adverse employment actions because an
employee suffered a work injury during the course of employment
that is compensable under chapter 386.

The court now determines that Chan's IIED claim
relating to his section 378-2 claim for disability discrimination
is barred by section 386-5.  Even if that were not so, nothing in
the record indicates that Wells Fargo's conduct was sufficiently
outrageous to justify damages for an independent II
ED claim.  At most, as described below, Chan asserts a disability
discrimination claim under section 378-2(1) based on Wells
Fargo's alleged failure to engage in an interactive process that
might have led to a reasonable accommodation allowing him to
return to work.  This is not conduct that "exceed[s] all bounds
usually tolerated by decent society and which is of a nature
especially calculated to cause, and does cause, mental distress
of a very serious kind."  Hac, 102 Haw. at 106, 73 P.3d at 60.
This does not mean that emotional distress damages are
unavailable to Chan under the lesser standard for such damages
for his other claims.  As in Furukawa, for example, Chan may seek
emotional distress damages for the alleged violation of section
378-2.

**D.   Summary Judgment is Granted With Respect to the
         Punitive Damage Claim Asserted in Count IV.**

Count IV of the First Amended Complaint asserts a
punitive damage claim.  Wells Fargo seeks summary judgment,

arguing that there is no such independent tort.  This court
agrees.  In <u>Ross v. Stouffer Hotel Co. (Haw.) Ltd.</u>, 76 Haw. 454,
879 P.2d 1037, 1049 (1994), the Hawaii Supreme Court approved of
the statement that "a claim for punitive damages is not an
independent tort, but is purely incidental to a separate cause of
action."  In <u>Kang v. Harrington</u>, 59 Haw. 652, 660, 587 P.2d 285,
291 (1978), the Hawaii Supreme Court noted that "[a]n award of
punitive damages is purely incidental to the cause of action."
This court has therefore dismissed or granted summary judgment
with respect to independent claims of punitive damages, noting
that punitive damages are a type of remedy incidental to other
causes of action.  <u>See Liberty Mut. Ins. Co. v. Sumo-Nan LLC</u>,
2015 WL 2449480, *6 (D. Haw. May 2, 2015) (dismissing claim of
punitive damages, but noting that punitive damages may be
available as a remedy for other causes of action); <u>Hale v. Haw.
Publs., Inc.</u>, 468 F. Supp. 2d 1210, 1233 (D. Haw. 2006) (granting
motion for summary judgment as to independent claim of punitive
damages, but noting that plaintiff could seek punitive damages as
remedy for other causes of action).

        At the hearing, Chan also agreed that he cannot
maintain an independent cause of action for punitive damages.
Accordingly, to the extent the First Amended Complaint asserts an
independent claim of punitive damages, summary judgment is

granted in favor of Wells Fargo.  However, Chan may seek punitive damages to the extent applicable in connection with other counts.

### E.    Count V--Disability Discrimination.

Count V of the First Amended Complaint asserts a violation of the Americans with Disabilities Act ("ADA") and section 378-2 of Hawaii Revised Statutes, specifically alleging that Wells Fargo denied Chan a reasonable accommodation of additional medical leave.

Under the ADA, an employer must make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A); see also Kaplan v. City of N. Las Vegas, 323 F.3d 1226, 1232 (9th Cir. 2003); McAllister v. U.S. Veterans Initiative, 2015 WL 2345595 (D. Haw. May 14, 2015).  The regulations implementing the ADA make it "unlawful for a covered entity not to make reasonable accommodation to the known physical or mental limitations of an . . . employee with a disability, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of its business." 29 C.F.R. § 1630.9 (2011).  "Once an employer becomes aware of the need for accommodation, that employer has a mandatory

obligation under the ADA to engage in an interactive process with the employee to identify and implement appropriate reasonable accommodations." Humphrey v. Mem. Hosps. Ass'n, 239 F.3d 1128, 1137 (9th Cir. 2001).

"An appropriate reasonable accommodation must be effective, in enabling the employee to perform the duties of the position." Id. (quoting Barnett v. U.S. Air, 228 F.3d 1105, 1115 (9th Cir. 2000). "Employers, who fail to engage in the interactive process in good faith, face liability for the remedies imposed by the statute if a reasonable accommodation would have been possible." Id. at 1137-38.

Section 378-2 of Hawaii Revised Statutes similarly makes it an unlawful discriminatory practice "[f]or any employer to refuse to hire or employ or to bar or discharge from employment, or otherwise to discriminate against any individual in compensation or in the terms, conditions, or privileges of employment" because of a person's "race, sex including gender identity or expression, sexual orientation, age, religion, color, ancestry, disability, marital status, arrest and court record, or domestic or sexual violence victim status if the domestic or sexual violence victim provides notice to the victim's employer of such status or the employer has actual knowledge of such status." Haw. Rev. Stat. § 378-2(1)(A).

35

"Hawai`i courts have recognized that the ADA and Hawai`i disability discrimination laws are similar and the Hawai`i Supreme Court has expressly adopted the ADA elements of a prima facie case as the elements of a prima facie H.R.S. § 378-2 case." Lovell v. United Airlines, Inc., 728 F. Supp. 2d 1096, 1102 (D. Haw. 2010). See also French v. Hawaii Pizza Hut, Inc., 105 Haw. 462, 467, 99 P.3d 1046, 1051 (2004) ("Because of the similarities between the ADA and our own HRS chapter 378, we adopt the analysis for establishing a prima facie case of disability discrimination under HRS § 378-2 that was established in Sutton v. United Air Lines, Inc., 527 U.S. 471, 119 S. Ct. 2139, 144 L. Ed. 2d 450 (1999).").

Employers are obligated to consider the particular circumstances of an employee's case to determine whether and under what circumstances an employee may be able to return to work. Dark, 451 F.3d at 1090. Ninth Circuit case law places this burden on employers, calling it an "affirmative obligation to engage in an interactive process in order to identify, if possible, a reasonable accommodation." Dark v. Curry Cnty., 451 F.3d 1078, 1088 (9th Cir. 2006). "Once an employer becomes aware of the need for accommodation, that employer has a mandatory obligation under the ADA to engage in an interactive process with the employee to identify and implement appropriate reasonable

36

accommodations." Humphrey v. Mem. Hosp. Ass'n, 239 F.3d 1128, 1137 (9th Cir. 2001).

"The interactive process requires (1) direct communication between the employer and employee to explore in good faith the possible accommodations; (2) consideration of the employee's request; and (3) offering an accommodation that is reasonable and effective." EEOC v. UPS Chain Solutions, 620 F.3d 1103, (9th Cir. 2010) (quotation marks and citation omitted). The employer is not required to provide the accommodation that an employee requests, and is only required to provide "some reasonable accommodation." Id. When an employer fails to engage in the interactive process, summary judgment is available to the employer only when a reasonable factfinder "*must* conclude that there would in any event have been no reasonable accommodation available." Dark, 451 F.3d at 1088 (quotation marks and citation omitted).

In Department of Fair Employment and Housing v. Lucent Technologies, Inc., 642 F.3d 728, 744 (9th Cir. 2011), the Ninth Circuit cited with approval a California case holding that a finite leave of absence is a reasonable accommodation under the ADA, provided it is likely that, following the leave, the employee will be able to perform his or her duties. Similarly, in Dark, 451 F.3d at 1090, the Ninth Circuit noted that unpaid medical leave, even extended medical leave or an extension of

that leave, may be a reasonable accommodation under the ADA.  The
ADA does not require an employee to demonstrate that such leave
is certain or even likely to be successful.  See Humphrey, 239
F.3d at 1136.  The Ninth Circuit has noted that "recovery time of
unspecified duration may not be a reasonable accommodation
(primarily where the employee will not be able to return to his
former position and cannot state when and under what conditions
he could return to work at all)."  Dark, 451 F.3d at 1090.  Other
circuits agree that "Indefinite leave is not a reasonable
accommodation."  See, e.g., Amsel v. Texas Water Dev. Bd., 464
Fed. Appx. 395, 400 (5th Cir. 2012); Fiumara v. President &
Fellows of Harvard Coll., 327 Fed. Appx. 212, 213 (1st Cir.
2009); Peyton v. Fred's Stores of Ark., Inc., 561 F.3d 900, 903
(8th Cir. 2009).

There is a question of fact as to whether Wells Fargo
failed to reasonably accommodate Chan's medical condition, which,
for purposes of this motion, Wells Fargo is not disputing was a
qualifying disability for purposes of the ADA and section 378-2.

Before he was terminated, but 22 months after he began
his medical leave, Chan's attorney requested a "reasonable
accommodation" of more unpaid medical leave beyond the 24 months
available under the company's policy.  Chan says he could have
returned to work if protected from his harassers and those who
retaliated against him.  Wells Fargo did not engage in an

interactive process with Chan to determine whether and under what circumstances Chan might be able to return to work, but it did extend the leave for a few more months.  Although it may well be that such an interactive process would have proved fruitless, as Chan apparently told his treating physician in June and July 2014 that he had to decide whether to resign or be fired and that his attorney recommended being fired, Wells Fargo has not demonstrated on this motion that no possible reasonable accommodation was available.

The record indicates that Chan was able to work in his aunt's floral shop, but was having anxiety concerning returning to work at Wells Fargo.  Because Wells Fargo did not engage in the interactive process of trying to determine whether there was some reasonable accommodation available to Chan that would have allowed him to return to work, and because the record does not establish as a matter of law that no such reasonable accommodation was available, summary judgment is denied with respect to Count V.  See Dark, 451 F.3d at 1088.

V.        CONCLUSION.

The court grants Wells Fargo's motion for summary judgment with respect to Count I (termination in violation of public policy claim), Count III (IIED claim), and Count IV (punitive damage claim).  The court denies the motion with respect to Count II (retaliation in violation of section 378-62

claim) and Count V (disability discrimination claim under section

378-2 and the ADA).

        IT IS SO ORDERED.

        DATED: Honolulu, Hawaii, August 24, 2015.



        /s/ Susan Oki Mollway
        Susan Oki Mollway
        Chief United States District Judge

Chan v. Wells Fargo Advisors, LLC, Civ. No. 14-00344 SOM/KSC; ORDER GRANTING IN PART
AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT